**M. C. GORDON et al., Plaintiffs,**

v.

**Carl LIPOFF et al., Defendants.**

**Jay N. POLLACK, Executor, Plaintiff,**

v.

**Carl LIPOFF et al., Defendants.**

**Civ. A. Nos. 16728–1, 16952–1.**

United States District Court,
W. D. Missouri, W. D.

Dec. 30, 1970.

 

Watson, Ess, Marshall & Enggas, Landon H. Rowland, Paul R. Lamoree, Kansas City, Mo., for plaintiffs.

Shughart, Thompson & Kilroy, Harry P. Thomson, Jr., Donald L. Shughart, Robert R. Raymond, George E. Leonard, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

### I.

### *Posture of the Case*

This case pends on defendants' motion for summary judgment. By separate stipulation the parties agreed that the issue of liability under § 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)–5 promulgated thereunder as alleged in Count I of plaintiffs' first amended complaint should be considered as a separate issue pursuant to Rule 42 (b), F.R.Civ.P. Under a similar stipulation the parties agreed that the issue of whether, under the procedural circumstances presented, this Court has diversity jurisdiction over claims alleged in Counts II and III of plaintiffs' first amended complaint should be separately considered.

In both stipulations the parties expressly agreed that plaintiffs have no further evidence to offer and that plaintiffs rely solely on the claims made in the plaintiffs' first amended complaint, on the facts set forth in the plaintiffs' narrative statement filed pursuant to Pretrial Order No. 2, and on the additional facts agreed to in each stipulation. The parties have further agreed that the Court should consider only the factual data now before the Court pursuant to the stipulations and that Rule 56 of the Federal Rules of Civil Procedure should be utilized to determine the issues presented.

Count I of plaintiffs' amended complaint alleged that plaintiffs were the owners of 85% of the common stock of the Burlington Manufacturing Company and that each of the individual defendants were partners in the firm of certified public accountants known as Lipoff, Sharlip, Pesman & Company until June 1, 1967. On that date the firm is alleged to have merged with Touche, Ross, Bailey and Smart, a national accounting firm.

Plaintiffs alleged that defendants and their predecessor firm were the sole accountants employed by Burlington and by the plaintiffs for over 25 years. Paragraphs 9 through 13 of Count I of the amended complaint alleged the following:

9. During the years 1963, 1964, 1965 and 1966, negotiations were conducted and specific offers were made by various national firms and individuals to the plaintiffs for the sale of part or all of the plaintiffs' shares in Burlington either through purchase or merger.

10. The plaintiffs rejected the several offers referred to in Paragraph 9 of this complaint. Plaintiffs rejected these various offers, because, relying on the financial statements prepared by defendants, plaintiffs concluded that the financial condition of Burlington, as indicated by the defendants' financial statements of Burlington, warranted a higher price for the sale of the stock of Burlington than had been offered.

11. In truth and fact the financial statements of the Burlington, prepared by defendants and relied upon by plaintiffs when they chose to reject the offers to sell their Burlington stock, contained certain untrue statements of material facts and did omit to state certain material facts necessary in order to make the statements not misleading.

12. The misstatements and omissions referred to in Paragraph 11 of this complaint caused the financial state-

ments and reports prepared by the defendants to overstate the true net book value of the Burlington.

13. The misstatements and omissions referred to in Paragraph 11 of this complaint caused plaintiffs to believe that the present and future value of their shareholdings in the Burlington was greater than in truth it was, and in that belief plaintiffs rejected the offers for sale of the stock in the Burlington referred to in Paragraph 9 of this complaint.

Plaintiffs then alleged that "on or about August 15, 1966, the defendants informed the First National Bank of Memphis, Tennessee that the July 1, 1966 report and financial statement which the defendants had prepared (and certified) was incorrect" (¶ 15); that thereafter the bank called a $1,600,000 loan owed by Burlington to the bank (¶ 16); and that still later, "on September 30, 1966 [plaintiffs] entered into and executed a stock purchase agreement * * * with Howard Hayes and Robert Hayes, or their nominees, to sell their shares of common stock in the Burlington * * * at a price which resulted in a substantial loss to plaintiffs" (¶¶ 17 and 19).[1]

Massive discovery was undertaken by the parties. Depositions of over 4,000 pages were taken of 16 witnesses. Hundreds of exhibits were introduced in those depositions, and thousands upon thousands of pages of documents were produced, examined, and marked as exhibits in preparation for trial. Both the time for the close of discovery and the time for filing plaintiffs' narrative

1. Plaintiffs pray for $2,000,000 damages in Count I of their amended complaint. An additional $2,000,000 is independently prayed for in Count II. Count III prays for $1,000,000 punitive damages. Examination of the pages of plaintiffs' narrative statement which relates to damages reveals that no specific amounts are set forth on any of those pages. Plaintiffs' "Statement of legal propositions and authorities relied upon," filed at the same time plaintiffs' narrative statement was filed, 'indicates, however, that plain-

tiffs apparently believe that they are entitled to recover unstated amounts for "breach of contract" (page 5); for "fraud" (page 7); for "negligent breach of contract" (page 8); for "loss of a going business [including] good will value" (page 9); for loss of earnings of one deprived of his "livelihood" (page 11); for "mental pain and anguish" (page 12); and for "mental suffering" (page 13). Plaintiffs' lack of specificity in regard to their alleged damage is as vague and generalized as their proof of liability.

statement (as well as the tentative trial date) were extended at various of the numerous pretrial conferences held throughout this litigation.

Pretrial Order No. 2, entered March 2, 1970 required that plaintiffs file "a detailed, written pre-trial brief, consisting of a narrative statement of all facts proposed to be proved by plaintiffs * * in the manner hereinafter ordered" (¶ 5). That order, consistent with the long established practice of this Court, followed the language recommended by the Manual for Complex and Multidistrict Litigation ("the Manual"). See Part 1, Paragraph 3.3, page 45 and Part 2, Paragraph 3.31, page 152 of the Manual where Alternate Paragraph N to Part III of Sample Pretrial Order No. 5 appears. That order (¶ 5(a)) required that "the narrative statement of facts shall set forth in simple, declarative sentences, separately numbered, the narration of all facts relied upon by plaintiffs in support of their claim for relief herein." It further required that "the narrative statement of facts shall be constructed to the best of the ability of plaintiffs' counsel so that the opposite parties and each of them will be able to admit or deny each separate sentence of the statement." And Pretrial Order No. 2 provided that "any factual issue * * not set forth in detail as provided in paragraph(s) 5 * * * shall be deemed abandoned * * * in further proceedings, the pleadings and other papers on file herein to the contrary notwithstanding, except for facts * * of which a party may not be aware and could not be aware in the exercise of reasonable diligence" (¶ 11).

Counsel were fully familiar with and were frequently advised of the prime importance of the function which a narrative statement serves in the orderly processing of complex litigation. They were cognizant that preclusion orders would be entered before trial in accordance with the principles stated in Part 1, Paragraph 1.4, page 13 of the Manual. Both the Court and the parties anticipated the realization of the maximum benefits to be derived from the narrative statements by having each party admit or deny each separate sentence contained in the narrative statement of facts of the adverse party. See Part 1, Paragraph 3.3, page 46 of the Manual. Experience in many cases before this and other courts has established that the procedures recommended by the Manual effectively eliminate disputes about many questions of fact which otherwise would take hours, days, and sometimes weeks of trial time.

Plaintiffs eventually filed their narrative statement. It is not necessary that we rule defendants' earlier motion to dismiss this action based upon plaintiffs' alleged failure to comply with Pretrial Order No. 2 in regard to both the form and substance of plaintiffs' narrative statement. Shortly after defendants filed that motion, they filed the pending motion for summary judgment. The stipulations of the parties remove any question concerning the propriety of ruling the pending motion for summary judgment on its merits. Indeed, we are of the view that under the circumstances such procedure would be proper even if the parties had not so stipulated. Part 1, Paragraph 2.11, page 21 of the Manual states that "ordinarily a motion for summary judgment should not be granted until a reasonable opportunity to complete discovery has been afforded, on this issue or issues material to the summary judgment." Implicit in the statement of that principle is the corollary that after complete discovery, motions for summary judgment may and should be entertained. The requirement that a narrative statement be filed in the form directed in this case afforded plaintiffs a full and fair opportunity to set forth all factual circumstances to support their action. Cf. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, at 290 to 299, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

In approving the parties' stipulation that the questions presented should be considered under Rule 56, this Court

recognized that the Eighth Circuit had stated in City National Bank of Fort Smith, Arkansas v. Vanderboom, 422 F. 2d 221, 223 (8th Cir., 1970), cert. denied 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970) that "summary judgment is an extreme remedy and that it should not be entered except when the movant is entitled to its allowance beyond all doubt." Consistent with and in recognition of the strict standard stated in *City National Bank* defendants properly concede that in our consideration of the legal questions presented, "the Court is to construe in the light most favorable to the plaintiffs all factual statements contained in [plaintiffs']. Narrative Statement" (Defendants' § 10(b) Brief, p. 2). We shall do so.

## II

*Coverage of § 10(b) and Rule 10(b)–5*

In the single case in which the Supreme Court has given direct attention to § 10(b) and Rule 10(b)–5, S.E.C. v. National Securities, Inc., 393 U.S. 453, 465, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), it was stated that the questions presented arose "in area where glib generalizations and unthinking abstractions are major occupational hazards." In regard to the coverage question presented (see footnote 9, page 467 of 293 U.S., page 572 of 89 S.Ct.), the Supreme Court stated that "[f]or the statute and rule to apply, the allegedly proscribed conduct must have been 'in connection with the purchase or sale of any security.' " (Ibid., at p. 466, 89 S.Ct. at p. 571). The Court accordingly added that "we must ask whether respondents' alleged conduct is the type of fraudulent behavior which was meant to be forbidden by the statute and rule." (Ibid., at p. 467, 89 S.Ct. at p. 572.) And in Erling v. Powell, 429 F.2d 795, 797 (8th Cir., 1970) our Court of Appeals stated: "The terms of the statute, of course, measure the implied right of action flowing therefrom."

Plaintiffs apparently concede that "an action for damages under the Act and Rule belongs to persons who can demonstrate direct damage incurred by conduct within the ambit of the statutory prohibitions." (Plaintiffs' Brief, p. 28). But plaintiffs make clear that they seek to escape and expand the obvious coverage limitations of § 10(b) and Rule 10 (b)–5. Plaintiffs, for example, state on page 28 of their brief that: "Although plaintiffs could base a claim solely upon being induced to hold their Burlington Securities—i. e. to forbear to sell them—by the misrepresentations about the value of those securities perpetuated by defendants * * * plaintiffs' case is not so limited." Consistent with their notion that there are no limitations to what sort of action may be maintained under § 10(b) and Rule 10(b)–5, plaintiffs did not even attempt to state factual circumstances in their narrative statement which could be said to support a finding that defendants in any way in fact engaged in any sort of a "manipulative or deceptive device or contrivance" within the meaning of § 10(b). Nor have plaintiffs, even in their brief in opposition to defendants' motion for summary judgment, attempted to specify whether the defendants' alleged violation of Rule 10(b)–5 in fact involved (1) some "device, scheme or artifice to defraud," within the meaning of clause (a) of Rule 10(b)–5; (2) whether their claim is allegedly based on some specific misrepresentation or nondisclosure in alleged violation of clause (b) of Rule 10 (b)–5; or (3) whether the defendants allegedly engaged in some "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security" in alleged violation of clause (c) of Rule 10(b)–5.

Rather, plaintiffs' brief abounds with the sort of generalizations and abstractions characterized in S.E.C. v. National Securities, Inc., *supra*, as occupational hazards in the rapidly developing area of § 10(b) and Rule 10(b)–5 law. Plaintiffs talk about " 'mitigating doctrines' easing the literal rule" of Birnbaum v. Newport Steel Co., 193 F.2d 461 (2d Cir., 1952), cert. denied 343 U.S. 956, 72 S.Ct.

1051, 96 L.Ed. 1356 (1952), (Plaintiffs' Brief, p. 21); they contend broadly that a § 10(b) "cause of action is based on plaintiffs' injury, not defendants' profit" (Plaintiffs' Brief, p. 16); and they assert that the "gravamen of any cause of action for damages is *injury* caused by a breach of duty" (Plaintiffs' Brief, p. 21; emphasis the plaintiffs'). Such abstract and general talk is further typified by plaintiffs' contention that "an action under § 10(b), which otherwise might not be cognizable * * * can [nevertheless] be maintained where the effect of defendants' conduct has been fully realized and the circumstances provide a measure of the damage suffered." And they make a related contention that "where the consequences of the wrong perpetrated had been effected, and the extent of the injury had become measurable", a cause of action under § 10(b) and Rule 10(b)–5 somehow ripens (Plaintiffs' Brief, p. 23).

All of plaintiffs' abstract generalizations are made in the face of their own reliance upon Judge Medina's dissent in Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir., 1968) (Plaintiffs' Brief, p. 18). Judge Medina made the point in his dissent that before a federal court should permit the "enormous" expense of discovery in a § 10(b) case, the plaintiff, as a matter of pleading, should be required to do more than simply allege "that the price was too low or too high, that the directors 'knew or should have known' it was too low or too high, [and] that this was a 'fraud' perpetrated against the corporation" (405 F.2d at 220). Judge Medina expressed his view that even to permit discovery without more would improperly permit a particular plaintiff "to transform a simple cause of action against directors for waste or the use of bad judgment in the sale of corporate assets into a fed-eral securities fraud case by judicial fiat" (405 F.2d at 220).

Plaintiffs' reliance upon our opinion in State of Missouri v. Stupp Bros. Bridge & Iron Co., 248 F.Supp. 169 (W. D., Mo., 1965) is also misplaced. In that case we refused to read into Section 4 of the Clayton Act the so-called "pass on" defense which was then particularly popular in antitrust circles. After directing attention to what we believed were the controlling Supreme Court cases, we concluded that "we are to read Section 4 of the Clayton Act in its ordinary and natural sense; that we are to consider its history and its policy; that we are to avoid restrictive constructions inconsistent therewith; and that we are not to engraft additions on the statute that Congress did not see fit to enact." (248 F.Supp. at 173).

The same general principles of construction stated in the Supreme Court cases cited in Stupp Bros., *supra*, are generally applicable to the construction of § 10(b) and Rule 10(b)–5. In *City National Bank* the Court of Appeals noted that the Supreme Court in S.E.C. v. National Securities, Inc. had stated that § 10(b) and Rule 10(b)–5 "constitute one of the several broad antifraud provisions set forth in the securities law" (422 F.2d at 229). The Eighth Circuit's disagreement in *City National Bank* with "the second step of the Second Circuit's test to the extent that it does not reflect recognition of a negligence standard" (Ibid., at 229–230) and its acceptance of the rationale of Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961), illustrates that the Eighth Circuit holds the view that § 10(b) and Rule 10(b)–5 should be given a broad and flexible construction consistent with the history and purpose of national securities legislation.[2] Certainly the Eighth Circuit's

2. The Supreme Court recently indicated in S.E.C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 185, 84 S.Ct. 275, 279, 11 L.Ed.2d 237 (1963), in which it construed a section of the Investment Advisors Act of 1940, 15 U.S.C. § 80b–5(2), (a statute quite similar in substance to § 10(b) and Rule 10(b)–5) that "Congress intended * * * securities legislation 'enacted for the purpose of avoiding frauds' [to be construed] not technically and restrictively but rather flexibly to effectuate its remedial purpose."

conclusion in Vanderboom v. Sexton, 422 F.2d 1233, 1238 (8th Cir., 1970), cert. denied 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed. 2d 90 (1970) that a § 10(b)–Rule 10(b)–5 action should be viewed "as a blue sky type of implied statutory action rather than as a basic fraud action" is consistent with the broad and flexible construction which the history and policy of federal securities legislation commands.[3] We shall therefore construe the statute and rule in accordance with the principles stated in the cases just cited.

It is one thing to say that a particular section of an Act of Congress and a rule promulgated pursuant to its authority should be given a broad and flexible construction consistent with the general purposes of the legislation of which it is a part. It is quite a different thing, however, to say that there are no limitations on the sorts of causes of action which federal courts may properly imply from § 10(b) and Rule 10(b)–5. *City National Bank* did recognize that "the extent of the coverage and liability imposed under Section 10(b) * * * and Rule 10(b)–5 has not yet been precisely defined" (422 F.2d at 229). But the Court of Appeals had no difficulty in affirming the District Court's grant of defendants' motion for summary judgment for the reason that "no reported case has extended Rule 10(b)–5's umbrella over such a wide area as is attempted by the investors in this case."

■ The basic and fundamental difficulty with plaintiffs' approach to this case from the outset has been their erroneous acceptance of the notion that judicial modifications of the requirements of standing as articulated in *Birnbaum* have had, or at least should have, the effect of removing all limitations of the coverage afforded by § 10(b) and Rule 10(b)–5 in regard to all plaintiffs who may seek to maintain private actions for damages under that statute and rule. It is our view that the cases which have modified the standing requirements of *Birnbaum* have not had the effect implicitly ascribed to those cases by plaintiffs. We find and conclude that plaintiffs must allege and prove factual circumstances which bring this particular case within the ambit of § 10(b) and Rule 10(b)–5 before they are permitted to recover damages under that section and rule.

### III

#### *Essential Elements of a § 10(b)–Rule 10(b)–5 Action*

The Eighth Circuit cases, perhaps more clearly than those of many of the other circuits, have clearly enunciated the essential elements which must be factually established to support a § 10 (b)–Rule 10(b)–5 action. In affirming a District Court's dismissal of a § 10 (b)–5 action (after a plenary evidentiary hearing on the question of jurisdiction) the Court of Appeals in Boone v. Baugh, 308 F.2d 711 (8th Cir., 1962) concluded that "Rule X–10B–5 goes no further than to carry out the statutory authority granted the Commission to designate more specifically the type of manipulative device that shall fall within the statutory prohibition." It then stated that:

Three separate acts are designated in § 10(b), to wit:

1. Use of mails or instrumentalities of interstate commerce.

2. Purchase or sale of a security.

3. Use of a manipulative or deceptive device.

There can be no violation of the statute unless all three acts are proven and a proper relationship among these acts is shown. [p. 713 of 308 F.2d.]

Myzel v. Fields, 386 F.2d 718, 733 (8th Cir., 1967), cert. denied 390 U.S. 951, 88

---

3. Cf. S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943) which held that the particular sections of the Securities Act of 1933 should be construed "in conformity with its dominant general purpose * * * so as to carry out in particular cases the generally expressed legislative policy."

S.Ct. 1043, 19 L.Ed.2d 1143 (1968) makes clear that: "The sufficiency of the evidence and the integrity of the verdict are best reviewed in the light of those cases arising under Rule 10(b)–5, in terms of (1) misrepresentation or nondisclosure, (2) materiality, (3) some form of scienter or intent and (4) reliance."

*City National Bank, supra,* fashioned a "two-step test" to be applied by District Courts in the Eighth Circuit under which the question of statutory coverage, as distinguished from the standing of the plaintiff, is to be determined. The Eighth Circuit indicated its partial agreement with the standards articulated by the Second Circuit in S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir., en banc, 1968) cert. denied 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Both Circuits are agreed that the device employed by the defendants must be, in the language of *Texas Gulf Sulphur Co.* (as quoted in *City National Bank*), "of a sort that would cause reasonable investors to rely thereon, and in connection therewith, so relying, cause them to purchase or sell a corporation's securities."

Using its own language, *City National Bank* formulated "step one" of the Eighth Circuit's test as follows:

With regard to misrepresentations, the question is whether a reasonable investor, in light of the facts existing at the time of the misrepresentation and in the exercise of due care, would have been entitled to rely upon the misrepresentation. With regard to nondisclosures, the issue becomes whether a reasonable investor, in light of the facts existing at the time of the nondisclosures and in the exercise of due care, would have been entitled to receive full disclosure from the party charged and would have acted differently had the alleged nondisclosure not occurred. [422 F.2d at 230]

"Step two" of the Eighth Circuit's test was stated in *City National Bank* as follows:

If the plaintiff satisfied this "in connection with" step, it then becomes necessary to determine whether the defendant's misrepresentation or nondisclosure was made with scienter or from a lack of due diligence. [422 F.2d at 230]

In footnote 10 appended to its enunciation of its second step test of coverage, *City National Bank* quoted the following from a comment entitled "Negligent Misrepresentations Under Rule 10(b)–5," 32 U.Chi.L.Rev. 824, 841–842 (1965):

It is not the defendant's position as insider per se which imposes the duty on him, but rather the possession of material facts to which the other party has no access.

\*　　\*　　\*　　\*　　\*　　\*

Not only should the plaintiff have to prove that he relied on the defendant's statements, but he must convince the trier of fact that his reliance was reasonable under all the circumstances at the time. In this way recovery would be denied to those who, because of their 'business sophistication', acumen, or ready access to the information involved, could reasonably be expected to exercise a higher degree of care and investigation in their dealings.

■ *City National Bank* must obviously be viewed as a more "liberal" opinion that the Second Circuit's landmark opinion in *Texas Gulf Sulphur.* But that does not mean that *City National Bank* has authorized unlimited actions under § 10(b) and Rule 10(b)–5. Erling v. Powell, 429 F.2d 795 (8th Cir., 1970) makes clear that an action which merely seeks to "recoup losses attributable to mismanagement" (Ibid., at 800) is not within the coverage of the statute for the reason that "Section 10(b) \* \* \* was directed solely at that type of misrepresentation or fraudulent practice usually associated with the purchase of securities." (Ibid., at 798). The Court of Appeals was satisfied in that case, on the basis of the pleadings alone, that the plaintiffs' claims "rest upon an alleged breach of fiduciary duty owing the corporation and other shareholders of National Life; not deception prac-

ticed in actually buying or selling securities" (Ibid., at 800). Erling v. Powell establishes that claims of that sort "do not fall within the ambit of § 10(b) or Rule 10(b)–5" (Ibid., at p. 800).

We therefore find and conclude that plaintiffs may not maintain an unlimited action and that the evidence presented in plaintiffs' narrative statement must be examined to ascertain whether the requisite elements of a § 10(b)–Rule 10(b)–5 cause of action (as those elements have been defined in the cases cited) have been established as a matter of fact.

## IV

### Interstate Commerce

Plaintiffs concede the validity of defendants' argument that failure on the part of plaintiffs to establish "use of any means or instrumentality of interstate commerce or of the mails" (within the meaning of § 10(b)) bars them from maintaining this suit. (Plaintiffs' Brief, p. 14). Plaintiffs also concede that "plaintiffs' Narrative Statement * * * does not contain a separate collection of allegations on the use of interstate commerce" (Plaintiffs' Brief, p. 38).

■ In an effort, however, to avoid their admitted failure to make any statement of any specific factual circumstances upon which a finding of this essential element of plaintiffs' cause of action could be predicated, plaintiffs state generally that: "The means of interstate commerce and the mails were used at every step of the course of conduct described in the narrative" (Plaintiffs' Brief, p. 38). That general statement, unsupported by any specific facts contained in plaintiffs' narrative statement cannot properly be utilized to cure plaintiffs' obvious failure of proof.

*Boone v. Baugh, supra,* establishes that sufficient evidence must be adduced by a plaintiff to support "a finding that the use of the mails and the fraudulent act bore a distinct relationship to the purchase or sale of securities" (308 F.2d at 713). The Court of Appeals affirmed the dismissal of plaintiffs' § 10(b) complaint in Boone v. Baugh because the factual circumstances developed at the plenary pretrial evidentiary hearing established that "the use of the mails or commerce in no way contributed to the sale of securities" (Ibid., at 714).

Count I of plaintiffs' amended complaint alleges generally that defendants violated some duty imposed by § 10(b) and Rule 10(b)–5 which caused them to refuse to accept certain offers for the purchase of their stock at prices higher than the price they eventually received. As we have noted, plaintiffs' brief concedes that their narrative statement does not contain any statements which specifically state the circumstances under which the mails or any facility of interstate commerce may have been used by the defendants in any particular factual situation. Plaintiffs' unsupported general assertion in their brief that "the means of interstate commerce and the mails were used at every step of [defendants'] course of conduct" simply does not afford a proper basis for the requisite finding.

■ Plaintiffs' failure to state in their narrative statement sufficient factual circumstances which, if considered to be true, could be said to support an interstate commerce finding reflects plaintiffs' first failure to establish a requisite element of a § 10(b)–Rule 10(b)–5 cause of action. We find and conclude that this circumstance standing alone and independent of any other ground requires that defendants' motion for summary judgment in regard to the § 10(b) issue be granted.

## V

### The Effect of Plaintiffs' Status as Insiders

Plaintiffs concede that plaintiffs were the "managers" of Burlington (Plaintiffs' Brief, p. 15). Particular pages of the narrative statement establish that plaintiffs, as a matter of law, must be

deemed to be "insiders" within the meaning of the rules of decision in § 10(b) and Rule 10(b)–5 cases. See pages 8, 275, and 301 of plaintiffs' narrative statement. Plaintiffs also concede "the universally accepted proposition" stated in Myzel v. Fields, *supra*, 386 F.2d at p. 736, that a "director [of a corporation whose stock is the subject of a sale or purchase in alleged violation of § 10(b) and Rule 10(b)–5] is chargeable with a degree of notice of those facts which the corporate books and the directors' meetings would fairly disclose." (Plaintiffs' Brief, p. 34).

In Myzel v. Fields the Court of Appeals, "not without great difficulty" (386 F.2d at 737), concluded that plaintiff Vertelney, a director (and therefore properly considered an insider as a matter of law; see Ibid. at 736), had adduced sufficient evidence to "create a jury case" (Ibid., 736–737). That conclusion was carefully limited to the specific factual circumstances presented in that particular case. Judge Lay, however, made clear that "If Vertelney had been misled *solely* by Phil Myzel's statements or nondisclosures *regarding the company's value*, and on that basis *alone* had sold his stock, recovery would be denied" (Ibid., at 736; emphasis ours). Myzel v. Fields carefully pointed out that it was only because the defendants in fact made misrepresentations in addition to their representations regarding the company's value that the Court was able to conclude that plaintiff Vertelney had made a case for the jury.

What is important in that case is the Court of Appeals' recognition and articulation of the rule that an insider, absent exceptional circumstances, must be held as a matter of law to have "superior knowledge of the financial status of the business, as well as its prospects and business policies" (Ibid., at 736). Application of that established rule requires that "hindsight reaction to an improvident sale by an insider to a stranger or even another insider, based upon undisclosed facts equally known *or available* to both parties, ordinarily would not be considered within the protective basis of Rule 10(b)–5" (Ibid., at 736; emphasis ours). Myzel v. Fields expressly adopted and applied the rationale and principles stated in Kohler v. Kohler Co., 319 F.2d 634 (7th Cir., 1963) to support its own conclusion of law that "there is no duty to disclose information to one who reasonably should already be aware of it." Judge Lay added, in reliance upon Hafner v. Forest Laboratories, Inc., 345 F.2d 167 (2d Cir., 1965) that there is no "necessity for one insider to 'search out details' for another insider, in the same sense that such a duty might exist toward others less informed."

■ Plaintiffs' narrative statement does not state any factual situation which even suggests that the defendants had any exclusive knowledge of any facts which might have affected the value of the Burlington stock. Nor does plaintiffs' narrative statement state circumstances which would bring this case within any of the exceptions to the general rule noted by Judge Lay in footnote 10 on page 736 of 386 F.2d. Plaintiffs' narrative statement simply does not state any sort of additional misrepresentations which permitted the Court of Appeals to resolve the difficult factual problem of Vertelney's right to recovery in that particular plaintiff's favor.[4]

---

4. Plaintiffs in Myzel v. Fields established that in addition to misrepresentations and nondisclosures which related solely to the value of the stock, the defendants had also falsely stated to Vertelney that Benn was "going to get out". The Court of Appeals also pointed out that Phil's agency for Benn was not disclosed and that "the true identity of the purchaser was effectively hidden from even a most alert director or insider" (386 F.2d at 737). Under all the combined circumstances, the Court of Appeals was therefore able to conclude that Vertelney had "presented sufficient proof of an 'assortment' of nondisclosures and positive misrepresentations to carry [his] case to the jury" (386 F.2d at 737). The factual circumstances stated in plaintiffs narrative statement do not remotely resemble those presented in Myzel v. Fields.

The rules in regard to what duties are owed to insiders under § 10(b) and Rule 10(b)–5 articulated in *Myzel v. Fields* were reiterated in *City National Bank.* In footnote 10 on page 230 of 422 F.2d *City National Bank* states that "the objective standard of a reasonable investor * * * effectively imposes a duty of reasonable investigation, thereby limiting the class of investors who will be protected under Rule 10(b)–5(2) to conscientious buyers or sellers in good faith." The Court of Appeals also indicated its agreement with the comment in 32 U.Chi.L.Rev. 824, 841–842 (1965) which states that "recovery would be denied to those who, because of their 'business sophistication', acumen, or ready access to the information involved, could reasonably be expected to exercise a higher degree of care and investigation in their dealings." (Ibid. at 230, footnote 10).[5] In holding that plaintiffs' claims in *City National Bank* were not within the coverage of § 10(b) and Rule 10(b)–5, the Court of Appeals found that plaintiffs, as a matter of fact, "had access to all the books and records" and that, although they had not actually seen a particular report, they "had access to this audit report" (422 F.2d at 231). Judge Gibson quoted the established rules from *Myzel v. Fields, Kohler v. Kohler Co.,* and *Shappiro v. Goldberg,* 192 U.S. 232, 241–242, 24 S.Ct. 259, 48 L.Ed. 419 (1904) and concluded that "[s]ince the investors had ready access to the information involved, it is reasonable to expect them to exercise a higher degree of care than third parties who were not sellers and did not profit from the sale * * *" (Ibid., 422 F.2d at 231). The established rule must be applied to the factual circumstances of this case.

Plaintiffs' narrative statement affirmatively establishes that plaintiffs were insiders. Their statement does not state any circumstances which would even tend to establish that they did not have ready access to all information which a reasonable investor who was an insider would consider in determining whether or not he would accept an offer to buy his stock. We find and conclude that plaintiffs' narrative statement fails to establish a factual situation under which defendants could have owed and therefore violated, any duty which might be properly implied from § 10(b) and Rule 10(b)–5 in light of the undisputed relationship between the parties as established by plaintiffs' narrative statement. Independent of any and all other grounds stated, defendants are entitled to summary judgment on the § 10(b) issue for the reasons stated in this part of our memorandum opinion.

## VI

### *Plaintiffs' Failure to Establish Misrepresentations, Nondisclosures, Reliance or Causation*

█ Even if it could be said that plaintiffs' claims are within the ambit of § 10(b) and Rule 10(b)–5 and that therefore the duties to be implied from the statute and rule could be said to include a duty not to misrepresent and a duty to disclose information already available to an insider, plaintiffs' narrative statement does not establish that the defendants did in fact misrepresent or fail to disclose any material fact in connection with any sale, aborted or otherwise, of plaintiffs' Burlington stock.

\* \* \* \* \*

Thus, a director making statements to other directors of the same corporation might reasonably assume that his listeners are themselves aware of the facts he is stating or are at any rate capable of checking them themselves, and that his statements are not likely to lead his listeners to actionable financial detriment.

5. See also the following from the next paragraph in the University of Chicago Law Review article immediately following the language quoted by Judge Gibson:

The key factor is the risk of harm to others when the speaker has greater access to relevant information, and the proposed duty should be delineated by this concept.

Plaintiffs' narrative statement is equally deficient in its failure to establish that plaintiffs in fact relied upon any alleged misrepresentation or nondisclosure. And plaintiffs have failed to establish that such reliance in fact caused the plaintiffs to reject any established firm offer to sell their Burlington stock. Each of those failures, both separately and collectively, constitutes additional, independent grounds for the granting of defendants' motion for summary judgment on the § 10(b) issue.

It is obvious that had this case ever reached trial, the instructions under which it would have been sent to the jury would have been patterned on the instructions approved by the Court of Appeals in Myzel v. Fields. The jury was instructed in that case, with the approval of the Court of Appeals, that in order to recover, plaintiffs must prove (386 F.2d at 733, footnote 6):

> That the defendants, or some of them, did use or employ manipulative or deceptive conduct in buying the plaintiffs' stock. More specifically, (a) that they made an untrue statement of a material fact; or (b) that they omitted to state a material fact which was necessary to prevent statements they did make from being misleading; or (c) that they failed to disclose a known fact which was not available to the plaintiffs and which they should reasonably have known would be important to the plaintiffs in determining the value of the stock which the plaintiffs held.

The following additional instruction was quoted with approval by the Court of Appeals in footnote 7, page 734 of 386 F.2d:

> [In order to recover, plaintiffs must prove] that the misrepresentations or omissions, if any, [must be] concerned or related to a material fact or facts. A fact or omission of fact is material if it concerns something that a reasonable man would consider important in deciding what he should do in a particular transaction.

The following instruction was also quoted with approval by the Court of Appeals in footnote 8, page 734 of 386 F.2d:

> Statements about the future growth and development of a company are classed as opinions or facts, depending upon the circumstances under which they were made. No recovery may be based on an expression of opinion by the defendants unless the opinion was completely unfounded and reckless, or unless it was deliberately intended to be misleading. The plaintiffs can also recover if you believe that the defendants gave any definite opinions or assurances about the future which they thought were false when they made them.[6]

And finally, the following instruction was quoted with approval by the Court of Appeals in footnote 9 on page 735 of 386 F.2d:

> That the plaintiffs [must have] relied on the alleged misrepresentation or omission. There is reliance by a plaintiff if the claimed wrongful conduct was or would be a substantial factor in determining the course of conduct which resulted in the claimed loss.

6. It should be noted that a specific finding of specific intent was included as a prerequisite to recovery in the above instruction. We note that the Court of Appeals stated that such a finding was "more demanding that the broader express terms of the statute and the rule" (Ibid., at 735). That point is not particularly important in ruling the pending motion because plaintiffs' narrative statement fails even to come close to reciting factual circumstances which, if considered to be true, would be sufficient to support other essential elements of any § 10(b)–Rule 10(b)–5 cause of action.

It is therefore apparent that we do not rule defendants' pending motion on the theory that plaintiffs must establish that their 'deceptive or manipulative conduct" consisted of "misrepresentations or omissions" made with *"the intent* of inducing plaintiffs to reject third party offers to buy their stock." We need not and therefore do not reach that question.

Plaintiffs contend generally that their narrative statement demonstrates that "plaintiffs considered and acted in accordance with *a substantial collection* of representations and reports in decling the Ward and Work Wear offers * * * *" (Plaintiffs' Brief, p. 6). Scattered throughout plaintiffs' brief are numerous other conclusory and generalized statements that various financial statements and accounting reports made by the defendants were "false." The language used in plaintiffs' brief and in their narrative statement is almost identical to that found in plaintiffs' amended complaint. Such language is obviously meaningless when used in a narrative statement prepared after the most extensive sort of discovery.[7]

Plaintiffs' narrative statement (at page 296) does establish that a meeting was held on July. 31, 1965 at defendant Sharlip's house. In attendance were plaintiffs M. C. Gordon and Robert C. Gordon and one Keith Wilson, vice president and general counsel for Burlington. On page 297 of their narrative statement, plaintiffs state that at this meeting defendant Sharlip stated that "the Burlington was a 'goldmine'" (p. 297(a)); that he could sell "the Burlington" to "one of his eastern contacts" for "a much greater price" than the $1.2 million offered by Wards (414(1), 297(b)); that the company could not help but continue to become more profitable in the future (297(d)) and therefore no sale should be made on present value without an escalator clause (297(c)); and that he wanted "a part of

the action" and compensation for procuring a buyer under even more favorable terms than the Montgomery Ward offer (297(e)–(f)).[8] Page 298 of plaintiffs' narrative statement simply states that "following this meeting the principal members of the Pollack, Normand, and Kabaker families were informed of Mr. Sharlip's statements."

In their brief, plaintiffs inserted a reference in their paraphrase of page 297 to page 414(1) of their narrative statement. Page 414(1) states in conclusory general language that: "Plaintiffs were induced by defendants' misrepresentations to refrain from selling the securities representing their respective interest in Burlington and to reject firm offers by major national corporations to purchase those securities, and thereby the business and assets of Burlington, of which one firm offer was for $1.2 million plus certain other considerations." Plaintiffs' statement on page 414(1) that "Defendants represented that the business was worth more and that plaintiffs would be well advised to wait a higher offer which *the value of the business* warranted" removes any possible doubt that the "goldmine" and other statements on page 297 of plaintiffs' narrative statement were considered by plaintiffs to have been made "regarding the company's value" in a manner quite comparable in substance to the nonactionable statements made by defendants to plaintiff Vertelney in Myzel v. Fields, supra, at 730 and 736.

Plaintiffs assert in their brief that the statements set forth on page 297 of plaintiffs' narrative statement were not

---

7. Other examples of plaintiffs' conclusory generalizations will be found on the indicated pages of plaintiffs' brief in opposition to defendants' motion for summary judgment: "the cost figures provided by the defendants as a basis for pricing were drastically underestimated" (Ibid., page 9) ; "the financial statements and accounting study reports * * * were false" (Ibid., p. 9) ; "defendants' calculations of the Burlington common stock book value and their various projections * * * were also false

and misleading" (Ibid., p. 10). Plaintiffs' narrative statement does not state how or why the various figures and calculations were "false" or how or when such figures in any way influenced the plaintiffs' actions.

8. We have expressly adopted plaintiffs' paraphrase (on page 6 of their brief) of what is stated on page 297 of their narrative statement. Certainly, plaintiffs' paraphase would not understate what is in fact stated on that page of their narrative statement.

"presented in lieu of the defendants' financial statements and accounting data reports, described through the bulk of the 525 paragraph narrative" statement (Plaintiffs' Brief, p. 6). The difficulty, however, with all other statements contained in plaintiffs' narrative statement, with the few exceptions to be noted, is that plaintiffs never attempted to state the manner in which any particular financial statement or accounting report may have in fact contained either a misrepresentation or a nondisclosure within the meaning of Rule 10(b)–5. The most that plaintiffs state is that the defendants in fact made various financial statements and accounting reports. The narrative statement totally fails to state how, or why, or in what respect any particular financial statement or accounting report in fact misrepresented or failed to disclose any particular fact which could be considered to be a material fact under the applicable law.

The total deficiency of plaintiffs' narrative statement is typically illustrated by plaintiffs' repeated reference in their brief to "the Montgomery Ward offer." The name "Montgomery Ward" does not even appear in plaintiffs' narrative statement. The only specific "offer" to which any reference is made in plaintiffs' narrative statement is one made by Workwear Corporation sometime in October of 1965. See page 309 of plaintiffs' narrative statement which states that "Keith Wilson, Burlington Vice-President * * * relying upon Sharlip's representation that the Burlington was a 'goldmine' turned down a firm offer from Workwear Corporation to purchase the stock of the Burlington for $850,000."

That statement does not, of course, state that the Workwear offer was made to the plaintiffs or that they, as distinguished from Mr. Wilson, in fact relied in October of 1965 upon defendant Sharlip's July 31, 1965 "goldmine" statement. Certainly, neither that statement nor any other portion of plaintiffs' narrative statement suggests that Mr. Wilson was authorized by plaintiffs either

to accept or to reject any offer on plaintiffs' behalf.

The more important point, of course, is that even if it be assumed that the offer was a firm offer made directly to plaintiffs for their stock and even if it be assumed that Mr. Wilson was in fact authorized to act for plaintiffs, plaintiffs' narrative statement is deficient in that it fails to state factual circumstances which would support findings that (1) defendants in fact misrepresented or failed to disclose any particular material fact in connection with that offer or that (2) plaintiffs in fact relied on some particular misrepresentation or nondisclosure in connection with that offer or that (3) plaintiffs' reliance in fact caused plaintiffs' refusal to accept the Workwear offer.

On page 7 of their brief plaintiffs concede that "plaintiffs' sale of their shares in Burlington, described on page 415 [to Robert F. Hayes and Howard Hayes on February 14, 1965 for $118,-817.91 (p. 412)] was not made in reliance upon any *specific* representation by defendants * * *." That concession makes clear that plaintiffs consider that sale as being relevant only on the issue of the alleged damages. That means, of course, that plaintiffs must establish that their damage was the result of their reliance on some specific misrepresentation or nondisclosure which caused them to reject the Workwear offer made in October, 1965.

On page 14 of their brief defendants challenged plaintiffs to point to a single factual statement in plaintiffs' narrative statement of any misrepresentation or nondisclosure which defendants were supposed to have made before October, 1965. Plaintiffs more or loss concede that no specific statements appear in their narrative statement in that regard. They attempt, however, to cure that obvious deficiency by contending, in their brief, that a statement which appears on page 459 of plaintiffs' narrative statement (which merely states that "Defendants prepared adjustments to the Burlington's six year statement of income

covering the years 1961–1965 sometime during the week ended March 19, 1966") somehow supports plaintiffs' assertion that their narrative statement contains a factual base for a finding that "false financial statements and accounting study reports were issued [by the defendants] as early as 1961 (459)."

The fact stated in the narrative statement, that "adjustments" were made "sometime during the week ended March 19, 1966" simply does not support plaintiffs' assertion that the narrative statement establishes that *"false* financial statements and accounting study reports were issued [by the defendants] as early as 1961." This case must be ruled on plaintiffs' narrative statement; not on unsupported assertions contained in plaintiffs' brief.

Plaintiffs' narrative statement does state that one particular financial statement received by the First National Bank in Memphis "sometime between August 12 and 15, 1966" revealed "for the first time" that Burlington had suffered a loss rather than a profit in 1966 (Page 380 of plaintiffs' narrative statement). But that single statement, standing alone, simply does not support plaintiffs' contention that the narrative statement in fact contains similar explicit statements with respect to all of the other "financial statements and accounting study reports, described on the pages of the narrative statement previously indicated" (Plaintiffs' Brief, p. 9).

Plaintiffs contend that their narrative statement in fact establishes "the falsity of the representations" made in every financial statement and accounting report ever issued by the defendants solely because the narrative statement does in fact state that "sharp discrepancies [were in fact found] between the unaudited interim financial statements for the first part of 1966 and the audited midyear statement covering the same period" (Plaintiffs' Brief, p. 9) and because the defendants made subsequent "adjustments" to their "audited statement for 1965 substituting a $34,000 loss for the $19,000 profit previously report-

ed in the audited statements of August 31, 1965 and December 31, 1965, for the period in which plaintiffs forbore to sell their securities in response to the Ward and Workwear offers (380–381); and by the adjustments made to the statement of income for 1961–1965 in March of 1966 (459)" (Plaintiffs' Brief, p. 10).

Pages 380–381 of plaintiffs' narrative statement, the only pages other than page 459 (which we have already discussed) to which our attention is directed, do not in fact contain any statements of fact which could be said to support any finding that the defendants issued any false financial statements of any sort except only those received by Jack Donaldson of the First National Bank in Memphis "sometime between August 12 and 15, 1966." Proof that a particular defendant may have issued an admittedly false statement in 1965 does not establish that each and every other statement which that person may have issued between 1961 and 1965 was also false. The very fact that plaintiffs failed to state in their narrative statement that any of the many financial statements or reports to which they make reference were in fact false, except the few above mentioned, is almost conclusive evidence that plaintiffs have long assumed that they need not prove this essential element of a § 10(b)–Rule 10(b)–5 action in order to recover.

But whatever the reason, plaintiffs' notion that statements of falsity contained in their narrative statement concerning a handful of defendants' financial statements and reports "for the periods ending August 31, 1965, December 31, 1965, and the months up to July 1, 1966" (Plaintiffs' Brief, p. 13) can somehow be extrapolated to all other financial statements and reports which defendants issued between 1961 and 1965 is simply not tenable.

The question presented on this branch of the case is not whether one who may make a negligent misrepresentation may be held liable under § 10(b) and Rule 10 (b)–5. The Eighth Circuit cases clearly establish that, under proper factual cir-

cumstances, he may be so held. The question presented is whether plaintiffs' narrative statement contains sufficient factual recitations upon which a finding that some sort of misrepresentation or nondisclosure of a material fact was actually stated. It is clear from what we have said that plaintiffs' narrative statement is deficient in regard to this essential element of any § 10(b)–Rule 10(b)–5 action and that this separate ground, standing alone, affords an independent basis for granting defendants' motion for summary judgment on the § 10(b) issue.

The related questions of whether plaintiffs' narrative statement contains a sufficient factual statement to support the additional essential separate elements of (a) reliance and (b) causation must be answered in the same manner. Plaintiffs' narrative statement identifies only the "goldmine" and other statements made at the July, 1965 meeting concerning the value of Burlington as the only specific statements upon which plaintiffs relied. Even if it be assumed that an insider has a legal right to rely on an accountant's statement that the business which the insider is running is a "goldmine" and that the accountant thinks the insider should hold out for a higher price, plaintiffs' narrative statement is deficient in regard to the prerequisite elements of reliance and causation. In regard to those elements, plaintiffs state on page 14 of their brief that "the proposition that causal connections between defendants' misstatements and plaintiffs' loss must be shown under Rule 10(b)–5, will not be challenged by plaintiffs."

The recent case of Reyos v. United States, 431 F.2d 1337 (10th Cir., 1970) makes extensive discussion of these two points redundant. That case properly applied the principles articulated in List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir., 1965) (a case frequently cited with approval by the Eighth Circuit). Both cases recognize, as do the Eighth Circuit cases, that both reliance and causation are essential prerequisite elements which must be established in a § 10(b)–Rule 10(b)–5 action. In *Reyos,* the Court of Appeals concluded that the district court's finding that the defendants had misrepresented and failed to disclose material facts was supported by the evidence. But the Court of Appeals reversed for the following reason:

In the case before us the facts of misrepresentation have been shown as to several of the transactions. The record, however, does not contain any evidence relating to reliance by the plaintiffs on the representations of the defendants Gale and Haslem. This is a necessary element of the cause alleged. [431 F.2d at 1348]

*Reyos* added that it is a "simple and fundamental proposition" that both reliance and a "causal connection must be established" (Ibid., at p. 1348). It is also a simple and fundamental proposition that if a plaintiff fails to establish either of those elements he cannot, for those separate and independent reasons, recover in a § 10(b)–Rule 10(b)–5 action. We find and conclude that defendants' motion for summary judgment on the § 10(b) issue must be granted for these two additional and separate reasons.

## VII

### *Burlington Purchases of Kabaker and Rayburn Stock*

On page 295 of the plaintiffs' narrative statement it is stated that under the terms of a stockholders' purchase agreement *"the company* became obligated to repurchase" and did in fact pay the estate of one Joseph Rayburn, a former officer and shareholder of Burlington, who died July 29, 1965, for stock covered by this agreement. Plaintiffs' narrative statement also establishes that the corporation, in another transaction, purchased and retired stock owned by one Harry Kabaker, a former employee of Burlington, sometime in 1966 (Plaintiffs' Narrative Statement, p. 300). It is clear that plaintiffs, as distinguished from the corporation, may not maintain any action under § 10(b) and Rule 10(b)–5 for any damages which

may have been caused by purchases of Burlington stock by the corporation itself.

▇▇▇▇ Plaintiffs concede, as they must, that "normally, deception causing a corporation to purchase or sell its stock is actionable by stockholders only in the form of a derivative suit" (Plaintiffs' Brief, p. 30). Both Vanderboom v. Sexton, *supra,* and Erling v. Powell, *supra,* articulate and apply the established rule. Plaintiffs' narrative statement does not atempt to establish factual circumstances to support a finding that the corporation was a sham. Nor was any attempt made to establish a factual base for any other ground which would warrant disregard of Burlington's corporate integrity.

We must therefore find and conclude that defendants' position in regard to the Kabaker and Rayburn stock is well taken and that plaintiffs have no standing to complain about those transactions in this case.

## VIII

### *Diversity Jurisdiction Issue*

The question of whether plaintiffs have a valid diversity jurisdictional basis for Counts II and III of their amended complaint is presented as a separated issue under the parties' second stipulation, filed October 2, 1970. When plaintiffs filed their original complaint, they did not in any way attempt to invoke the diversity jurisdiction of this Court. Indeed, it was apparent from the face of plaintiffs' original complaint that no basis for diversity jurisdiction was present, in that the residence of all plaintiffs was not in fact diverse from that of all defendants.

Some four months later, but before any of the defendants had filed answers or any other responsive pleading (all defendants had filed a joint motion to dismiss) plaintiffs filed their first amended complaint. All the defendants named in the original complaint who were Missouri residents were not named as parties defendant in plaintiffs' first amended complaint. It is clear, however, that

plaintiffs have never sought an order of Court, pursuant to Rule 21 F.R.Civ.P. to drop the originally named Missouri defendants as parties to this case.

Rule 21 explicitly provides that "Parties may be dropped or added by order of court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Plaintiffs contend that compliance with Rule 21, under the circumstances of this case, is not necessary; they rely upon that portion of Rule 15(a) F.R.Civ.P. which states that "[a] party may amend his pleading once as a mater of course at any time before a responsive pleading is served. * * *" Plaintiffs argue that a party may be and is dropped if he is not included in the amended pleading. Plaintiffs' contention, of course, rests upon the implicit assumption that Rule 15(a) abrogates the requirements of Rule 21, at least to the extent that the plaintiffs, rather than the Court, have control over whether parties originally named in a case are to be dropped from or added to that case up to the point, whenever that may be, that "a responsive pleading is served."

Plaintiffs cite no authority to sustain their contention. Every case which has considered the precise question has ruled against plaintiffs' proposed construction of Rule 15(a) and Rule 21. See Mitchell v. Carborundum Co., 7 F.R.D. 523 (W.D. N.Y., 1947); Pacific Gas & Electric Co. v. Fibreboard Products, Inc., 116 F.Supp. 377 (N.D., Calif., 1953); International Brotherhood of Teamsters, etc. v. American Federation of Labor, 32 F.R.D. 441 (E.D., Michigan, 1963) and Perry v. Snyder, 33 F.R.D. 361 (E.D., Pennsylvania, 1963). All those cases presented the narrow question of adding or dropping parties by amendment of the pleadings before the service of a responsive pleading. See also Burlington Hospital v. Charles Pfizer, 48 F.R.D. 343 (S.D. N.Y., 1969); Spencer v. Dixon, 290 F. Supp. 531, 535 (W.D., La., 1968); Aarhus Oliefabrik, A/S v. A. O. Smith Corp., 22 F.R.D. 33 (E.D., Wisc., 1958); Hargrove v. Louisville & Nashville Rail-

road Company, 153 F.Supp. 681 (W.D. Ky., 1957) and Henry v. First National Bank of Clarksdale, 50 F.R.D. 251, 260 (N.D., Mississippi, 1970), involving different procedural situations in which the courts stated the broad principle that a party may not be added or dropped at any stage of a pending action except by order of court under Rule 21. In Henry v. First National Bank of Clarksdale, *supra,* footnote 5 at p. 260, the Court quoted Professor Moore's appropriate and succinct statement that "Rule 21 governs the procedure for dropping or adding parties, and requires an order of the court. Consequently, a party may not be added by amendment of the complaint as of course" 3 Moore's Federal Practice, § 15.07 [2]. Moore states the rule of decision articulated in all the cases cited. We have found no intimation or authority for plaintiffs' notion that a party may be dropped by amendment of the complaint without an order of Court.

We recognize, of course, that the Federal Rules of Civil Procedure should be liberally construed and applied in accordance with their declared purpose. But we also recognize, as the cases cited illustrate, that the question of whether parties should or should not be dropped from or added to an action presents problems of judicial administration over which the Court, rather than the parties and their counsel, should maintain control at every stage of the action. Rule 21 so provides. Neither Rule 15(a) nor the Notes of the Advisory Committee intimate than an exception to Rule 21 was intended by the provision of Rule 15(a) which permits a party to amend without leave of court before a responsive pleading is filed.

We therefore find and conclude that plaintiffs' argument is not tenable; that the Missouri defendants are still parties to this action; and that diversity jurisdiction does not exist. Defendants' motion for summary judgment on this separate issue should therefore be granted.

## IX

### *Pendent Jurisdiction Issue*

Regardless of the fact that this Court may not properly exercise diversity jurisdiction, the question remains as to whether, under all the circumstances, this Court should nevertheless exercise pendent jurisdiction over plaintiffs' non-federal claims as they may be alleged in plaintiffs' first amended complaint. Principles articulated in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) control the exercise of our discretion in regard to the pendent jurisdiction question presented. See Vanderboom v. Sexton, supra, 422 F.2d at 1241–1243. See also, Lowenfels: Pendent Jurisdiction and the Federal Securities Act, 67 Col.L. Rev. 474 (1967).[9]

Plaintiffs, in their current set of briefs, refer to Counts II and III as their "common law" counts. Comparison of plaintiffs' original complaint with their amended complaint, however, shows that Counts II and III of plaintiffs' amended complaint are no more than Chinese copies (except for plaintiffs' jurisdictional allegations, their ineffective effort to drop all residents of Missouri as parties defendant, and one insignificant sentence which plaintiffs added to paragraph 23 of Count II of their amended complaint) of exactly the same

9. The cited article analyzes the application of the doctrine of pendent jurisdiction to actions instituted under the Investment Company Act of 1940, the Public Utility Holding Company Act of 1935, and the Securities Acts of 1933 and 1934. The author accurately states: "These acts have superimposed upon state corporation laws a set of standards and concepts designed primarily to protect the public investor in securities. A sig-

nificant development under these federal statutes has been the growth of judicially created private civil liabilities to redress violations of the statutory standards. Many plaintiffs, moreover, have attempted to enlarge their rights in this area by utilizing the doctrine of pendent jurisdiction to join common law claims to their federal securities acts claims in federal courts." [Footnotes omitted.]

allegations which were first alleged in Count I of their original complaint. So far as the pleadings are concerned, it is quite apparent that when plaintiffs' original complaint was attacked by defendants' joint motion to dismiss, plaintiffs inserted a new Count I and moved the original allegations of their original complaint into what are now Counts II and III of their first amended complaint. What are now Counts II and III of plaintiffs' first amended complaint are no more than verbatim copies of what first appeared in this case as paragraphs 6 through 24 of Count I of plaintiffs' original complaint and paragraphs 26 through 29 of Count II of that complaint.

In defending against defendants' motion to dismiss their original complaint, plaintiffs contended that they had stated a federal cause of action under § 10(b) and Rule 10(b)–5. Plaintiffs, of course, now contend that those same allegations should be read as stating a Missouri common law (and not a federal securities act) cause of action.

The question, of course, is not whether plaintiffs put the proper label on those allegations when they were defending them against defendants' motion to dismiss their original complaint or whether those claims are now properly labeled as common law claims, as plaintiffs have done in their briefs in opposition to defendants' pending motion for summary judgment. Those circumstances stated are important only in that they illustrate the refusal of many to recognize that § 10(b) and Rule 10(b)–5 do not vest the federal courts with jurisdiction over any and all causes of action recognized by State law which basically involve claims of corporate mismanagement.

The Court of Appeals made clear in Erling v. Powell, *supra*, that the claims of corporate mismanagement there involved, "[i]f cognizable at all, must be presented to a state court" for the reason that "[s]uch claims do not fall within the ambit of § 10(b) or Rule 10(b)–5" (429 F.2d at 800). Most significantly the Court of Appeals relied upon 6 Loss, Securities Regulation 3631–3645 to support its conclusion (Ibid., footnote 5).

Pages 3631 to 3645 of Professor Loss' treatise are devoted to "Corporate mismanagement generally." Professor Loss opens his discussion of that subject by stating at page 3631 that:

> By this point in the narrative one may well ask whether there is *any* limit to the lusty growth of the dubiously sired babe named Rule 10(b)–5, short of a complete federal take-over of the field of corporate mismanagement, generally, as long as a security transaction can be found (as very often it can) somewhere in the picture. [emphasis, Loss']

Professor Loss answers that question by stating on the same page that a "mismanagement action pure and simple [cannot] be transformed into a federal action under Rule 10(b)–5 'by the expedient of conclusory allegations, where one would not otherwise exist.' Lester v. Preco Industries, Inc., 282 F.Supp. 459, 462 (S.D., N.Y., 1965)." And on the final page of that discussion, page 3645, Professor Loss directs attention to the following comment in Judge Pollack's opinion in Christophides v. Porco, 289 F.Supp. 403, 406 (S.D., N.Y., 1968) in which he dismissed an aborted seller's complaint for failure to state a federal claim:

> The complaint herein is representative of a growing number of 10(b)–5 suits brought in this Court on unique, esoteric and implausible legal theories. Innovation is not to be discouraged, nor the imaginative instinct dulled. However, claims cloaked in a tissue of confusion devoid of federal jurisdiction or legal merit, impede rather than foster progress in the field of investor protection.

Plaintiffs' narrative statement does not even attempt to segregate the factual circumstances which they contend would sustain recovery under Count I from those which they contend would sustain a recovery under Counts II and III. As noted, plaintiffs once claimed that the present allegations of Counts II and III stated a § 10(b)–Rule 10(b)–5 claim. If the allegations of Counts II and III, as they originally appeared in Counts I and

II of plaintiffs' original complaint are to be taken as stating a § 10(b) action, as plaintiffs originally contended, it is clear that what we have said about the § 10(b) claim asserted in Count I of plaintiffs' first amended complaint is applicable to present Counts II and III and that, accordingly, discretion should be exercised against exercising pendent jurisdiction over claims subject to summary judgment.

If, on the other hand, plaintiffs' most recent label of Counts II and III is to be taken as accurate and if, therefore, we should consider those allegations as stating a state common law action for fraud, it is apparent that plaintiffs cannot recover under those counts for the reasons stated by Judge Gibson in the last paragraph of *City National Bank,* 422 F.2d at 232. It was there concluded that if plaintiffs are not entitled to recover "under the more liberal and broader coverage of Rule 10(b)–5, it is clear that they have not shown any basis for a common law fraud action under [state] law." [10] Pendent jurisdiction certainly should not be exercised over that sort of a claim.

The only remaining possible theory of liability which may be said to be asserted in Counts II and III would be some sort of as yet undefined action based upon an alleged violation of an accountant's common law duty to his client, assuming, of course, that plaintiffs rather than Burlington could maintain such an action. See Note: Accountants' Liabilities for False and Misleading Financial Statements, 67 Col.L.Rev. 1437 (1967). But that sort of a cause of action is entirely different from either a § 10(b) claim or a common law fraud action. The evidence necessary to prove such a cause of action is basically and fundamentally different from the evidence which is relevant and material in either a § 10(b) or a common law fraud action.

Application of the principles articulated in United Mine Workers of America v. Gibbs, which substantially modified the sometimes confusing test of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), makes it clear that discretion should not be exercised in regard to such a possible action as might be broadly implied in the allegations of Counts II and III of plaintiff's first amended complaint. United Mine Workers of America v. Gibbs recognized that "pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a [federal] claim. * * *" (Ibid., 383 U.S. 725, 86 S.Ct. 1138.) But that case made clear that "pendent jurisdiction is a doctrine of discretion, not of plaintiffs' right." (Ibid., 726, 86 S.Ct. 1139).

The factors which control the exercise of discretion must balance "considerations of judicial economy, convenience and fairness to litigants" with appropriate observance of the principle that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law." (Ibid., 726).

United Mine Workers of America v. Gibbs states that the issue of whether pendent jurisdiction should be assumed and exercised "is one which remains open throughout the litigation" (Ibid., 727). That case contemplated that "pre-trial procedures * * * may reveal a substantial hegemony of state law claims" (Ibid., 727). And, most importantly, United Mine Workers of America v. Gibbs directs that, absent perhaps some highly exceptional circumstances, "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well" (Ibid., 726). That principle, of course, is based upon the proposition that "recognition of a federal court's wide latitude to decide ancillary questions of

10. The applicable Missouri cases setting forth the essential elements of a common law fraud action, which are consistent with the Arkansas rules of decision al-

luded to by Judge Gibson in City National Bank, are collected in Kaufman v. C.R.A., Inc., 243 F.Supp. 721, 725 (footnote 3), (W.D., Mo., 1965).

state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case." (Ibid., 727).

One of the many difficulties created by plaintiffs' unsuccessful effort to expand the coverage of § 10(b) beyond the limitations inherent in any statutory cause of action is the fact that plaintiffs may not have given appropriate consideration to their possible claim against defendants for an alleged violation of the duties imposed upon accountants by virtue of State law. Such a claim, assuming that it could be said to have been properly pleaded in this case, certainly was not appropriately developed in plaintiffs' narrative statement. So far as the questions of law presented in connection with such a claim are concerned, we are confident that the State courts would afford the parties "a surer-footed reading of [the] applicable law" of Missouri which must be applied. The questions presented in such an action are difficult and unsettled.

The development of the common law in this area has been greatly influenced by the famous 1931 decision of the New York Court of Appeals in Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 174 N.E. 441 (1931). Questions concerning whether the same or different standards should be applicable to an accountant's work as it relates to auditing on the one hand and presentation on the other and questions of whether privity and scienter should or should not be required are both difficult and, many times, undecided questions.[11]

■■■ Familiar considerations of State and federal relationship and comity command that "federal courts should not be ever eager to hold on the determination of the issues that might be more appropriately left to settlement in state court litigation." (383 U.S. at 726, 86 S.Ct. at 1139, footnote 15, quoting Judge Magruder's oft-cited concurrence in

Strachman v. Palmer, 177 F.2d 427, 431 (1st Cir., 1949)). We believe that under all the circumstances, it would not be proper, as a matter of discretion, for this Court to exercise pendent jurisdiction over any of plaintiffs' state law claims.

Our consideration of this question has raised another question which we shall discuss in the next part of this opinion.

X

*Interlocutory Orders on the Merits and Order Directing Further Proceedings*

It is apparent that we are of the view that defendants' motion for summary judgment should be granted, that diversity jurisdiction over any of plaintiffs' claims does not exist, and that, as a matter of discretion, we should not exercise pendent jurisdiction over any of plaintiffs' State claims.

We are concerned, however, about the possible future use of the extensive discovery which has been undertaken in this case. We deem it appropriate that further consideration be given to the question of whether or not the final judgment to be entered in which defendants' pending motions will be granted should include some provision designed to insure the parties that the depositions taken and the other discovery completed may be used without objection in any other litigation which plaintiffs may seek to maintain.

Counsel have not yet been afforded an opportunity to state their views in regard to that question. Nor is the Court confident that, absent the agreement of all parties, it has power to include such a provision in its final judgment. It is therefore appropriate that further proceedings be directed in order that a conference be convened to discuss the question stated.

Accordingly, and for the reasons stated, it is

11. The note on accountants' liabilities in 67 Col.L.Rev. at 1441 stated a hypothetical case posed by another writer and com-

mented that: "It is impossible now to state with confidence how a British or American court would decide the case."

Ordered that defendants' motion for summary judgment should be, and the same is hereby, granted. It is further

Ordered that defendants' position in regard to the separated question relating to the lack of diversity jurisdiction should be, and the same is hereby, sustained. It is further

Ordered that, as a matter of discretion, this Court should not, and hereby determines that it will not, exercise pendent jurisdiction over any and all of plaintiffs' State claims. It is further

Ordered that counsel for the parties promptly confer and thereafter prepare, serve and file a suggested form of final judgment in which each shall include (in the event that all the parties are not in full agreemnt) their respective suggestions concerning the question which relates to the future use of the depositions and other discovery taken in this case. It is further

Ordered that the parties promptly confer and thereafter arrange for a convenient time for a conference with the Court at which time the form of final judgment will be determined. Such conference shall be scheduled not later than five (5) days from the date hereof, unless such time be extended within the five (5) day period.